AFFIDAVIT

I, Benjamin Wallace, Special Agent, Federal Bureau of Investigation ("FBI"), being sworn, state as follows:

1. I am a Special Agent with the FBI's Boston Field Office. I have worked for the FBI since 2009. Before joining the FBI, I was a Special Agent with the United States Secret Service ("USSS") for approximately four years. Before that, I worked as a police officer with the City of Atlanta, Georgia Police Department for approximately five years.

2. I am presently assigned to FBI Boston's Organized Crime Task Force (the "FBI Task Force"). The mission of the FBI Task Force is to identify, investigate, disrupt and dismantle sophisticated criminal organizations operating in Massachusetts, with a particular focus on those groups connected to national or transnational criminal networks that pose the greatest threat to the national and economic security of the United States. The FBI Task Force utilizes a broad array of techniques to conduct these investigations, including utilizing information received from confidential human sources; examining and exploiting telephone, social media, and financial records; and embedding undercover agents in dangerous groups that are difficult to infiltrate.

3. I submit this affidavit in support of an application for a criminal complaint charging that, from in or about May 2021 to the present, (1) Jin Hua ZHANG, (2) Licheng HUANG, (3) Feng CHEN, (4) Roger LUO, (5) Thong NGUYEN, (6) Augustin VILLA, and (7) Mariano SANTANA (the "Targets") conspired to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). I further allege that during that same time period, ZHANG conspired to distribute and to possess with intent to distribute 5 kilograms or more of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

4.      During this investigation, the FBI Task Force used cooperating witnesses ("CWs") and undercover agents ("UCs") to infiltrate a criminal organization which was led by ZHANG and launders large sums of money for various criminal groups. Agents on the FBI Task Force first detected the network in greater Boston but also identified leaders and members of the group throughout the United States and overseas. Over the past year, agents determined that ZHANG and his crew (the "ZHANG Organization") laundered at least $25 million worth of drug proceeds and profits from other illegal businesses. To date, agents have traced funds from the ZHANG Organization to Hong Kong and elsewhere in China, India, Cambodia, and Brazil, among other locations. The investigation also revealed that the ZHANG Organization distributed kilogram-sized quantities of cocaine, a Schedule II controlled substance, and MDMA, or ecstasy, a Schedule I controlled substance, to FBI CWs and UCs.

5.      This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts necessary to establish probable cause to believe that the Targets committed the violation(s) set forth in the accompanying criminal complaint.

6.      <u>The Money Laundering Conspiracy</u>. In May 2021, a Boston-area member of the ZHANG Organization, HUANG, began to have a series of discussions with a cooperating witness (CW-1).[1] In these exchanges, which agents recorded or preserved, HUANG asked CW-1 on behalf of his "boss" (later identified as ZHANG) if CW-1 knew anyone who could launder the proceeds

---

[1] CW-1 began providing information to agents when it was unable to pay debts it incurred to an extortionate lender. In exchange for information, agents paid CW-1, who used the funds to help resolve its debt. Since then, CW-1 has been paid for its work in this and other investigations. CW-1 has been advised that agents will take steps to ensure CW-1's safety and the safety of CW-1's family. CW-1's information has been corroborated by agents and by the investigation generally. For that reason, I believe CW-1 is reliable.

of drug sales by converting United States currency into Chinese renminbi (RMB) and then having those funds deposited in Chinese bank accounts.[2]

7.  Based on this information, the FBI Task Force designed an undercover operation to identify the network of money launderers working with HUANG's group (which ultimately led to ZHANG) and to identify the sources of the illicit funds that the group sought to launder. Agents directed CW-1 to make HUANG a counterproposal: CW-1 would agree to introduce HUANG to other criminals (in reality, FBI undercover agents) who could help HUANG and his group convert drug funds into cryptocurrency. Based on my training and experience, I know that cryptocurrency is a decentralized, peer-to peer, computer network-based medium of exchange that may be used as a substitute for government-issued currency. Cryptocurrencies have legitimate uses but are also used for criminal purposes such as money laundering and are often used as a means of payment for illegal goods and services. Cryptocurrency is stored in a virtual account called a wallet. Those who use cryptocurrency for illicit purposes often maintain multiple wallets in an effort to thwart law enforcement's ability to track purchases or transfers.

8.  Over a series of phone calls and meetings in June and July 2021, CW-1 introduced HUANG to two undercover agents, UC-1 and UC-2 (collectively, the UCs). UC-1 spoke Mandarin and posed as a West Coast-based criminal. UC-2 posed as UC-1's partner and a money launderer based in Boston. UC-1 explained to HUANG that he used UC-2 to launder money, including drug proceeds, by converting the funds to cryptocurrency, which could then be more easily transmitted to China or elsewhere without being detected by law enforcement. UC-1 and UC-2 explained to

---

[2] CW-1 communicated with HUANG on a cellular telephone registered to HUANG at his home address. CW-1 identified HUANG from a Registry of Motor Vehicles (RMV) photograph.

HUANG that UC-2 charged a fee for this service, and that the fee varied based on the level of danger involved. For instance, the fee charged for laundering funds derived from low-risk internet-based scams was smaller than the fee charged for funds derived from drug trafficking.

9. On July 28, 2021, agents recorded a meeting between CW-1, the UCs, and HUANG in Newport, Rhode Island. During this meeting, HUANG explained to the UCs that his "boss" needed to launder large amounts of proceeds from marijuana trafficking. The UCs, in turn, explained to HUANG how the group's drug proceeds would be converted into cryptocurrency. Once HUANG contacted CW-1 to report he would have cash to convert, HUANG and CW-1 would agree to meet at a predetermined location (often a public area, like the parking lot of a bank or grocery store or coffee shop). Once there, a courier would bring a bag containing a bulk cash delivery. CW-1 would confirm that the correct amount of money had been delivered. CW-1 would then contact UC-2 by phone. After UC-2 received confirmation that the funds to be laundered had arrived, UC-2 would transfer an equivalent amount of cryptocurrency, minus a fee for the service, to a digital wallet provided to UC-2. The UCs explained that the person in control of the digital wallet (later determined to be ZHANG) would be able to confirm the transfer within seconds.

10. During the meeting, UC-2 made a small cryptocurrency transfer to a digital wallet that HUANG identified as belonging to his "boss." When HUANG called his "boss," UC-1 observed that the contact name on HUANG's telephone was "Hua." Agents reviewed telephone records from HUANG's cell phone and determined that HUANG had called 917-916-3567, which according to a law enforcement database was a telephone number associated with ZHANG.

11. <u>HUANG and CHEN Made Bulk Cash Deliveries In August 2021</u>. After the mechanics of the money laundering operation were established, HUANG began to contact CW-1 to arrange meetings to drop off bags of cash to be converted to Tether, a type of cryptocurrency.

These meetings took place in the manner established at the July 28, 2021 meeting. HUANG contacted CW-1 to advise that he had a customer with cash to drop off. HUANG provided CW-1 with a location and an approximate time for the meeting and the amount of cash to be converted. Before the meeting, agents met with and searched CW-1, equipped CW-1 with an audio-video recording device, and surveilled CW-1 to the meeting location. At the meeting, HUANG's money laundering customer would arrive with cash which would be provided to HUANG and CW-1. UC-2 then transferred an equivalent amount of Tether to a digital wallet controlled by ZHANG. At the outset, fees were added to the bulk cash dropped off to CW-1. Beginning in January 2022, fees were deducted from the cash total. The fees charged fluctuated over time but generally ranged between 1.5 – 2% of the total amount of cash dropped off. When the meeting ended, agents followed CW-1 to a predetermined meeting location where CW-1 was again searched and turned in the recording equipment and the collected cash. Agents counted the bulk cash, placed the cash in a temporary vault, and eventually deposited the cash into an FBI account.

12.     On August 6, 2021, HUANG arranged to meet CW-1 at a TD Bank parking lot in Quincy to convert approximately $30,000 in cash to Tether. Before CW-1 arrived, agents observed a black Acura sedan registered to HUANG and his wife park in the lot. For 20 minutes, HUANG and CW-1 were in contact with their respective partners while continuing to speak to each other. At 7:21 p.m., a blue Porsche Macan arrived at the location (the plate came back to a rental / short-term leasing agency) and HUANG approached the passenger side window of the Porsche. CW-1 walked over to Porsche a short time later. The Porsche pulled in behind the Acura and while CW-1 was present, agents observed HUANG use the speaker function of his cell phone to talk to a voice agents identified as ZHANG's. At 7:43 p.m., agents observed a white bag pass from inside the Porsche through the passenger side window to CW-1. Both HUANG and CW-1 left the bank

parking lot. Agents followed CW-1 to a predetermined meeting location and turned in a bag containing $30,550.

13. After the meeting, CW-1 advised agents that he observed HUANG dial the phone number for the courier who delivered the cash in the white bag and provided agents with the number, 617-953-1920. When agents ran the number through a law enforcement database, the number was associated with CHEN. On August 7, 2021, agents showed CW-1 an RMV photo of CHEN and CW-1 positively identified CHEN's photo as the driver and occupant of the Porsche.

14. On August 19, 2021, HUANG, ZHANG, and CHEN again worked to launder $30,500 in cash. For this deal, agents introduced a second cooperating witness, CW-2.[3] Also, because HUANG wanted to meet UC-2 in person, UC-2 was present at the meeting and provided cryptocurrency, minus the fee, in exchange for cash in the presence of HUANG and CHEN while in contact by phone with ZHANG.

15. The meeting occurred as follows: HUANG arranged to meet CW-1 at an address in Quincy and after the meeting started, agents observed CHEN driving a black Ford F150 truck registered to him park at the meeting location. CW-1, CW-2 and HUANG approached CHEN's Ford F150 truck. Shortly thereafter, UC-2 arrived and parked his vehicle nearby. CHEN brought a pink and blue bag containing $30,500 in cash. CHEN handed the bag to HUANG who in turn

---

[3] Agents approached CW-2 after they identified CW-2 as a participant in criminal activity at a Boston-area business. After agents confronted CW-2 with its conduct, CW-2 agreed to provide information to law enforcement. CW-2 initially cooperated in the hopes that if CW-2 provided truthful information, CW-2 would not be charged in connection with CW-2's criminal conduct. CW-2 sold its interest in the business at the direction of agents. Thereafter, CW-2 was paid for its work in this and other investigations. CW-2 has been advised that agents will take steps to ensure CW-2's safety and the safety of CW-2's family. CW-2's information has been corroborated by agents and by the investigation generally. For that reason, I believe CW-2 is reliable.

handed the bag to UC-2. While HUANG and CHEN were present, UC-2 converted the cash to Tether and sent the digital currency to ZHANG's digital wallet, minus the laundering fee. ZHANG confirmed to UC-2 by phone that he had received the digital currency transfer. UC-2 gave CW-1 the bag containing the cash and UC-2 and CW-2 left together. Agents followed CW-1 and the cash back to a predetermined meeting location where CW-1 gave agents the bag of money.

16.     <u>Agents Direct the CWs to Contact ZHANG</u>. On November 16, 2021, agents directed CW-1 and CW-2 to place a recorded telephone call to ZHANG. CW-1 and CW-2 introduced themselves as friends of HUANG who had done "U" (an abbreviation for USDT, or "Tether") transactions in Boston with HUANG. CW-1 reminded ZHANG that he had spoken to him before with HUANG. CW-1 introduced CW-2 as an assistant to UC-1, the West Coast-based criminal. During the call, ZHANG explained that HUANG does not have a high degree of tolerance for larger cash transactions and that HUANG cannot carry the burden if something goes wrong or the money is taken by law enforcement. ZHANG stated that if the first transaction can be done face-to-face in New York, ZHANG can do at least "20" (meaning $200,000). CW-1 said that their bosses (UC-1 and UC-2) would also agree to send someone to New York for cash pickups. ZHANG told CW-1 and CW-2 that he could do $200,000 to $300,000 a day, maybe up to $500,000. ZHANG said he just found a new agent in Boston who is handling "5" ($50,000) to "10" ($100,000) units for ZHANG every day. (Agents identified this "agent" for ZHANG as ROGER LUO, who made several bulk cash drop offs in November 2021 and January 2022.)

17.     After this call between CW-1, CW-2, and ZHANG, agents were able to use CW-1 and CW-2 to communicate directly with ZHANG. The money laundering operation worked exactly as described above – the ability to communicate with ZHANG directly obviated the need for the CWs to coordinate transactions through HUANG.

7

18.  <u>Bulk Cash Drop Offs With LUO</u>. Between November 2021 and January 2022, LUO, a Boston-area courier for ZHANG, delivered bulk cash to be converted to Tether to CW-1 and CW-2 on four occasions. On November 22, 2021, ZHANG and CW-1 communicated over a WeChat messaging application[4] where ZHANG arranged for CW-1 to collect $70,000 in cash to be converted to Tether, plus a 1.5 % fee. ZHANG told CW-1 to meet a male Chinese courier at a Starbucks on Adams Street in Milton. Using the procedures set out above, agents surveilled CW-1 to the Starbucks at 10:17 a.m. At 10:23 a.m., agents observed a Chinese male wearing a black hooded sweatshirt, black pants, and a black facemask enter the Starbucks. CW-1 then walked outside and sat at a table with the man, who was carrying a large brown paper bag. At 10:38 a.m., agents received a phone call from UC-2, who reported that CW-1 called him to confirm that CW-1 was in possession of the cash. UC-2 transferred $70,000 in Tether to ZHANG's digital wallet and CW-1 gave agents the brown bag containing $71,050 (including the 1.5 percent fee of $1,050).

19.  On November 30, 2021, CW-1 arranged with ZHANG to conduct another cash pick up in exchange for USDT totaling $203,000 (including the 1.5 percent fee of $3,000). CW-1 and ZHANG negotiated the cash pickup over Telegram, which ZHANG had requested they use. CW-1 and CW-2 met with LUO in Cambridge and collected the $203,000 and UC-2 sent $200,000 USDT to ZHANG's digital wallet.

20.  On January 12, 2022, ZHANG and UC-2 used Telegram to arrange for a $70,000 cash pick up plus a 1.5% fee. ZHANG told UC-2 to send CW-1 to a Whole Foods parking lot on Harrison Avenue in Boston. Using the procedures set out above, CW-1 arrived at 1:42 p.m. Agents

---

[4] Communications over WeChat lasted about one week before agents directed CW-1 to transition to Telegram, an end-to-end encrypted messaging application that CW-1 had on its phone and that ZHANG also used. Agents preserved these communications whenever possible.

observed LUO arrive at the Whole Foods carrying an orange bag. LUO got into CW-1's car. At 2:00 p.m., CW-1, who was still with LUO, called UC-2, to report that he had $71,050 in cash and to transmit $70,000 in Tether to ZHANG's digital wallet. Thereafter, CW-1 met with agents and turned in the orange bag containing $71,050 in cash.

21.    On January 14, 2022, agents conducted a nearly identical deal with LUO, this time for $101,500 in cash at the South Shore Place in Braintree. At 11:30 a.m., CW-1 arrived at the parking lot and parked near Lord & Taylor. At 11:32 a.m., agents saw LUO on his phone near the Cheesecake Factory restaurant. Agents saw LUO walk toward two cars, a white Toyota Highlander and a red Jeep Liberty. Agents observed a female in the Highlander. After LUO made it to the cars, LUO turned and walked back to the Cheesecake Factory with a large black shopping bag and the Highlander drove off. CW-1 drove to where LUO was standing and LUO got into CW-1's car. After a brief meeting, during which LUO provided CW-1 a black bag containing a cardboard box with $101,500, UC-2 transferred $100,000 in Tether to ZHANG's digital wallet.

22.    <u>Other Boston-Area Couriers Laundered Cash Through ZHANG's Organization</u>. Beginning in or around March 2022, ZHANG and his associates began to use a token system to verify the identity of the UC or CW who would pick up ZHANG's cash (and later drugs). First, the UC or CW would send a photo of a dollar bill to serve as the "token" for the transaction. ZHANG or one of his associates would send this photo to his money or drug courier. When the FBI UC or CW would arrive to accept the cash or drugs, he/she would give ZHANG's courier the actual dollar bill, verifying that he/she was the person who was supposed to retrieve the cash or drugs.

23.    <u>NGUYEN Delivered $103,800 on March 16, 2022</u>. One courier to use this verification system was NGUYEN. On March 15, 2022, ZHANG advised UC-2 to expect to

receive a bulk cash delivery from a customer of ZHANG's, eventually identified as Thong NGUYEN. ZHANG and UC-2 agreed on a 2% fee to convert the cash into Tether. During an exchange of text messages, CW-1 sent images of the dollar bill token to NGUYEN and NGUYEN and CW-1 agreed to meet the next day at the parking lot of a Chipotle restaurant in Saugus. On March 16, 2022, agents observed CW-1 enter a Toyota Tacoma truck registered to NGUYEN. During the recorded meeting between NGUYEN and CW-1, CW-1 showed NGUYEN the dollar bill that he had previously photographed and sent by text. NGUYEN told CW-1 that the funds being picked up were from marijuana sales and handed CW-1 a black bag containing $103,800. UC-2 then transferred Tether to ZHANG,[5] minus a 2% fee of $2,080. After the transaction was completed, CW-1 left with the cash to meet with agents and NGUYEN quickly entered and exited the restaurant. Agents photographed NGUYEN as he left the restaurant and identified him from the video recording and surveillance as the man who dropped off the cash to CW-1.

24. <u>Agents Seize $109,850 and a Firearm From NGUYEN</u>. On April 11, 2022, ZHANG contacted CW-1 and told CW-1 that $100,000 needed to be collected from the same Vietnamese group that CW-1 had met with before. At 10:20 a.m., agents began surveillance at NGUYEN's home. Agents saw NGUYEN leave his home carrying one gray and one yellow bag. Agents eventually asked a Massachusetts State Police trooper in a marked cruiser to conduct a traffic stop of NGUYEN on Route 495 near Wrentham.

25. NGUYEN provided the trooper with a valid Massachusetts driver's license in his name. NGUYEN informed the trooper and agents that he had a firearm under his seat in a lock

---

[5] In this instance, UC-2 made the Tether transfers to ZHANG in multiple installments.

box and that he had a license to carry the firearm (NGUYEN showed the license to the trooper). He also admitted that there was a bag of cash in the back of the truck. NGUYEN claimed that the cash was a down payment for a real estate venture collected from family members and that the cash had been in his truck for several days. When agents asked NGUYEN for his phone numbers, NGUYEN provided two numbers. When agents observed three cellular telephones on the passenger seat of the truck, NGUYEN claimed he did not know the number for the third phone and did not know how to determine what it was. When agents showed NGUYEN how to look up the phone number on the third device, agents confirmed it was the phone used to contact CW-1 for the March 16, 2022 bulk cash drop off. Agents seized a Glock 43x 9 millimeter semiautomatic pistol, two Glock magazines containing ammunition, and a gray bag containing $109,850 in U.S. currency from NGUYEN's truck. NGUYEN was provided with a receipt and allowed to leave.

26.     Later that day, CW-1 received a text message from an as-yet unidentified dispatcher working for ZHANG's network. The dispatcher told CW-1 that the driver could not meet CW-1 today and that the meeting was cancelled.

27.     <u>VILLA Delivered $75,860 on May 26, 2022</u>. On May 26, 2022, ZHANG advised UC-2 to expect to receive a bulk cash delivery from a customer of ZHANG's organization, eventually identified as Augustin VILLA. Over Telegram, a dispatcher working for ZHANG contacted CW-1 to meet the courier at a Home Depot in Cranston, Rhode Island. CW-1 sent a photograph of a dollar bill to ZHANG to be passed on to the courier and using the procedures set out above proceeded with agents to the meeting location. When CW-1 arrived, ZHANG's dispatcher told CW-1 by text that the courier was driving a black Chevrolet SUV. Ten minutes later, a black Chevrolet Equinox SUV registered to VILLA pulled into the parking lot. CW-1 entered VILLA's car. During the brief recorded meeting, CW-1 provided VILLA with the dollar

bill previously photographed and transmitted to ZHANG and VILLA handed CW-1 a bag containing $75,860 in cash. UC-2 sent an equivalent amount of Tether, minus a $1,520 fee, to ZHANG's digital wallet. CW-1 identified a driver's license photograph of VILLA as the courier he met with.

28.     SANTANA Delivered $60,000 Over Two Days In June 2022. On June 1, 2022, a ZHANG dispatcher contacted CW-1 to arrange a bulk cash delivery on June 2 in the greater Boston area. Using Telegram, the dispatcher directed CW-1 to provide a photo of a dollar bill token and bring that dollar to the cash delivery to verify CW-1's identity at the meeting location, which was eventually determined to be a parking lot of a business in Quincy. Using the procedures set out above, agents and CW-1 proceeded to the parking lot. Shortly after CW-1 arrived, a heavy-set Hispanic man, later identified as Mariano SANTANA, exited a rental car carrying a plastic bag. SANTANTA walked across the parking lot and got into CW-1's vehicle.

29.     During the recorded meeting inside CW-1's vehicle, SANTANA asked CW-1 for the token, which CW-1 provided. SANTANA told CW-1 that the bag he was delivering contained $30,000. After receiving the cash, CW-1 sent the dispatcher and ZHANG a Telegram message confirming that CW-1 had received the cash. Shortly thereafter, either the dispatcher or ZHANG remotely deleted the group Telegram messages arranging the delivery.

30.     CW-1 left the parking lot, met up with agents, and handed in the plastic bag SANTANA provide. Inside the bag, agents found a cardboard box containing $30,000 bundled with rubber bands. Agents obtained rental car company records for the vehicle SANTANA drove to deliver the cash. Those records indicate that SANTANA rented the car. After reviewing a Massachusetts driver's license photo of SANTANA, CW-1 confirmed that SANTANA was the person who delivered the cash.

31.     On or about June 7, 2022, CW-1 received another bulk cash delivery from SANTANA. This delivery was arranged the same way ZHANG and the dispatcher arranged the prior delivery, with Telegram messages and the use of a dollar bill token and CW-1 met SANTANA in the same Quincy parking lot to complete the deal. Shortly after CW-1 arrived, SANTANA exited the business carrying a black plastic bag containing $29,800 in cash. Following the delivery, either ZHANG or the dispatcher again deleted the Telegram messages arranging this bulk cash delivery. After the delivery, agents observed SANTANA drive away in the same vehicle he drove to the June 2 delivery.

32.     <u>ZHANG Identified Other Sources of Funds To Be Laundered</u>. On January 10, 2022, ZHANG and an associate went to the One Brooklyn Hotel in Brooklyn, New York, for a meeting with the FBI UCs and CW-1. During the recorded meeting, UC-1 explained his fictitious money laundering business. UC-1 described how his business was mostly from Latin America. UC-1 indicated that he usually charges 7% for "powder" money, which was a reference to money derived from cocaine trafficking. UC-1 further explained that to safely launder this money, he would send it through multiple layers, and even if law enforcement investigated, the funds would not appear to be the proceeds of criminal activity. As a result, UC-1 told ZHANG, both UC-1 and his money laundering customers were protected.

33.     In response, ZHANG explained that he and his associates also receive money from similar sources (i.e., drug proceeds), but he received all of this money in cash. ZHANG indicated that the money he received in New York were mostly from cocaine trafficking, which he referred to as "Latin American," or the proceeds of marijuana trafficking, which he called "leaf." ZHANG also clarified that money that appears to be from marijuana traffickers sometimes includes cocaine proceeds, which he referred to as "white."

34. ZHANG asked the UCs if they have dealt with what he called "T5" money. In response, the UCs told ZHANG that the money they launder comes from all different sources. ZHANG explained what he meant by "T5" money. According to ZHANG, these funds come from victims of fraud schemes. These funds are transferred from business or personal accounts when a victim is convinced under false pretenses to transfer money to a fraudster's account. ZHANG provided the UCs with following example of a T5 scheme: a scammer uses social media, such as Instagram or Facebook, to lure a victim to "invest in" cryptocurrency. The victim is led to believe that he or she is making money, so the victim invests more. However, eventually, the scammer takes the victim's money. ZHANG indicated that if the loss amount is small, neither the police nor the bank would investigate. But if the loss is large enough, ZHANG said the FBI could get involved. Normally, by the time the victims realize that they are being scammed and report the fraud to the bank or police, the proceeds have been transferred out of the fraudsters' bank account that was receiving the victim's money. However, once the fraud is detected, the bank or law enforcement would know that the receiving account was involved with an online fraud. Therefore, the accounts are often closed. ZHANG's description of the fraud schemes highlighted a problem that ZHANG and his associates discussed regularly with the UCs and CWs during this investigation and worked to overcome, namely, finding ways to extract funds from the accounts to which fraud victims send money without leaving a trail of accounts that can be traced to the fraudsters who were responsible for tricking the victims into parting with their money.

35. <u>ZHANG's January 27, 2022 Pick Up of $190,000 At Frank Pepe's Pizza in New Haven, Connecticut</u>. Beginning on January 25, 2022, ZHANG and UC-2 began to plan for a $200,000 money bulk cash pick up. At about 8:27 p.m., UC-2 sent ZHANG a message over Telegram: "Cash pick up about noon?" ZHANG responded, "Will know by 11 pm after my guy

pick the find [sic] funds." On January 26, 2022, UC-2 texted ZHANG, "How's it looking bro?" ZHANG responded, "Still Waiting for answers since morning." At 2:22, ZHANG sent a message, "I thnk [sic] need to be rescheduled" and UC-2 replied "OK, let m know" and told him he was holding Tether for him. At 8:29 p.m., ZHANG called UC-2 and they arranged to conduct a $190,000 bulk cash pick up the next day. UC-2 sent ZHANG the address "Frank Pepe Pizzeria Napoletana, 14 Wooster Street, New Haven, CT" at 1:00 p.m. UC-2 told ZHANG that he and CW-2 would meet him there. UC-2 told ZHANG, "I'll buy you lunch if you come" and ZHANG replied "hahaha thanks."

36. On January 27, 2022, a surveillance team accompanied UC-2, CW-2, and another undercover agent posing as an employee of UC-2 to the restaurant. At 12:48 p.m., UC-2 sent a message to ZHANG over Telegram: "We are here having lunch." ZHANG responded, "Enjoy will be there 26 minutes." At 1:13 p.m., ZHANG texted UC-2, "I'm here." UC-2 replied, "You wanna come in or you want [CW-2] to come out?" ZHANG told UC-2, "Just send her out." UC-2 responded, "OK she's coming." Three minutes later, ZHANG texted UC-2, "190k only" and "Not 200k." UC-2 responded, "Ok take fee of [sic] the top?" ZHANG responded, "Yes you can." UC-2 did the math, "Ok I will send 186200," then asked ZHANG "same wallet as before?" Over Telegram, ZHANG forwarded UC-2 the address for the digital wallet.

37. Agents saw CW-2 and the UC walk out of the restaurant and enter a white Toyota sedan. Agents saw two men in the car. CW-2 entered the Toyota alone. ZHANG was in the front passenger seat and an Asian male was in the driver's seat. ZHANG told CW-2 that it was risky to bring the money inside the pizzeria and that he felt more comfortable in the car. ZHANG told CW-2 that he needed UC-2 to launder larger amounts of money because the current volume was too small. ZHANG also asked CW-2 if CW-2 had heard about the fact that one of his money couriers

15

had stolen $200,000 from him last week. CW-2 was handed a bag of money by ZHANG. CW-2 contacted UC-2, who wired the Tether to ZHANG's digital wallet. Once UC-2 confirmed that the deal was done (he texted a screen shot of the Tether exchange to ZHANG over Telegram), CW-2 and the undercover agent walked back into the restaurant carrying the bag of cash and the Toyota drove off. The bag contained $190,000 in cash.

38. On January 30, 2022, ZHANG and UC-2 exchanged messages over Telegram about a $25,000 wire transfer. ZHANG confirmed the account number with UC-2 and UC-2 asked whether the exchange would take place today and ZHANG replied, "tomorrow." On January 31, 2022, at 11:36 a.m., ZHANG used Telegram to send UC-2 an image of the Bank of America receipt showing the $25,000 wire transfer to an FBI undercover account, along with the text, "T5." At 11:52 a.m., ZHANG texted UC-2, "please check." At 1:35 p.m., UC-2 responded "OK," "It's processing, should clear in an hour and I will send 24250," and "Same wallet?" ZHANG responded "yes." After this exchange, ZHANG sent UC-2 a fifteen second audio message about a deal in a few days (after Chinese New Year): ZHANG explained the source of these funds: "it's like gambling money . . . its's not, umm, scam money . . . it's gambling money, right now I'm testing, they are sending the money to my account first, if it's ok, I'm thinking of sending some of the money to your account. Is that ok?"

39. <u>ZHANG's Drug Trafficking</u>. On or about August 11, 2022, agents recorded communications between ZHANG and UC-2 over Telegram. In the messages, ZHANG advised UC-2 that he had sent three (3) kilograms of cocaine to the Boston area for sale. UC-2 agreed to pay ZHANG for a portion of the cocaine now and pay for the remaining cocaine at a later date. UC-2 and ZHANG agreed that ZHANG would be paid for the cocaine in cryptocurrency transferred to a digital wallet provided by ZHANG.

40. ZHANG then had his courier ("Courier 1") contact CW-1, who was working with UC-2. By text message, Courier 1 advised CW-1 that the cocaine would be available for pick up the following day in Chinatown, a Boston neighborhood. Courier 1 and CW-1 arranged to meet around 11:00 a.m. near the South Station MBTA terminal, near Chinatown.

41. On August 12, 2022, at approximately 10:50 a.m., agents met with CW-1 near South Station. Agents searched CW-1 to make sure CW-1 was free of money or contraband and equipped CW-1 with a transmitter and an audio-video recording device. Thereafter, CW-1 drove to meet Courier 1 and pick up the three (3) kilograms of cocaine.

42. At South Station, CW-1 called Courier 1 on the number provided by ZHANG. A few minutes later, Courier 1 arrived. Courier 1 and CW-1 got into CW-1's vehicle. Courier 1 told CW-1 that they "needed to drive to where the cocaine was" and directed them a short distance away to Beach Street in Chinatown. Once parked on Beach Street, agents observed a tall, young, thin Asian male ("Courier 2") enter CW-1's car carrying a backpack. While inside the car, Courier 2 pulled a cardboard box from the backpack and left the box for CW-1. Inside the box were two kilograms of cocaine in vacuum sealed bags and one kilogram of cocaine inside a clear plastic bag. Courier 1 and Courier 2 then got out of the vehicle and walked away on foot toward Chinatown.

43. Agents followed CW-1 back to a predetermined meeting location. CW-1 was again searched and found to be free of money or contraband. Agents downloaded the video recording of the meeting which captured the meeting between CW-1, Courier 1, and Courier 2. Agents conducted a field test on the substance in the box and the test returned a positive result for the presence of cocaine, a Schedule II controlled substance. The approximate weight of the bags with packaging was 3,432.0 grams. After the meeting, UC-2 used Tether to pay ZHANG for one kilogram of cocaine (UC-2 sent the funds to a digital wallet provided by ZHANG).

44. During the investigation, ZHANG also communicated with UC-2 to arrange and facilitate the delivery of additional controlled substances. Over Telegram, ZHANG negotiated with UC-2 and subsequently directed ZHANG Organization couriers to make the following drug deliveries to FBI UCs and/or CW-1:

| Date | Location | Controlled Substance | Quantity |
|---|---|---|---|
| May 25, 2022 | Jersey City, NJ | Cocaine | 1,077.1 g |
| July 14, 2022 | Jersey City, NJ | MDMA | 1,035.4 g |
| September 5, 2022 | Boston, MA | Cocaine | 2,416.9 g |

45. <u>Conclusion</u>. Based on the information set forth above, I submit that there is probable cause to believe that the Targets conspired to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). I also believe there is probable cause to believe that ZHANG conspired to distribute and to possess with intent to distribute 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Section 846.

I, Benjamin Wallace, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

/s/ Benjamin Wallace
_____
Benjamin Wallace
Special Agent
Federal Bureau of Investigation

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this 7th day of October 2022.



The Honorable M. Page Kelley
Chief United States Magistrate Judge