UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 22-10279-AK |
| ) | |
| 2.    LICHENG HUANG, ) | |
| Defendant ) | |

SENTENCING MEMORANDUM OF THE UNITED STATES

On July 16, 2024, LICHENG HUANG ("defendant") pleaded guilty to money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). The final version of the Pre-Sentence Report prepared by the United States Probation Office, dated October 17, 2024 ("PSR"), found that HUANG's total offense level ("TOL") was 17, his criminal history category ("CHC") was I, and his guideline sentencing range ("GSR") was 24-30 months in prison. PSR, ¶¶ 29, 34, 58. For the reasons set out below, the government requests that this Court sentence HUANG to 30 months in prison, a sentence within his correctly calculated guideline range, along with three years of supervised release.

THE OFFENSE

The Money Laundering Scheme. During a two-year investigation, the Federal Bureau of Investigation (FBI) identified a significant criminal organization that laundered large sums of money for various criminal groups. Agents first detected the network in greater Boston and eventually identified the leader of the organization, JIN HUA ZHANG, based in Staten Island, New York, and a number of his criminal associates. The investigation revealed that, for a fee, ZHANG laundered bulk cash for drug dealers and laundered profits from other illegal businesses.

In order to infiltrate ZHANG's operation, agents posed as criminal money launderers with access to cryptocurrency. ZHANG and other members of his group would pick up bulk cash or

receive wire transfers from illegal business. ZHANG then arranged for agents to convert these funds into cryptocurrency. In recorded meetings, ZHANG discussed the various sources of these funds, which included profits from cocaine and marijuana trafficking as well as internet-based scams. ZHANG was charged a fee for converting the funds to cryptocurrency, and the size of the fee depended on the danger associated with the illegal funds.

The money laundering operation captured by the superseding indictment was massive. In less than one year, ZHANG and his associates laundered at least $25 million worth of drug proceeds and funds from other illegal businesses through the FBI undercover agents. Agents traced funds from the ZHANG organization to Hong Kong and elsewhere in China, India, Cambodia, and Brazil, and seized cash and cryptocurrency in accounts tied to ZHANG. PSR, ¶¶ 8-9.

HUANG's Role. Agents became aware of ZHANG and his organization through HUANG. In May 2021, HUANG began to have a series of discussions with a cooperating witness (CW-1). In these exchanges, HUANG asked CW-1 on behalf of his "boss" (later identified as ZHANG) if CW-1 knew anyone who could launder the proceeds of drug sales by converting United States currency into Chinese renminbi (RMB) and then having those funds deposited in Chinese bank accounts. Agents directed CW-1 to make HUANG a counterproposal: CW-1 would agree to introduce HUANG to other criminals (in reality, FBI undercover agents) who could help HUANG and his group convert drug funds into cryptocurrency, which could then be more easily transmitted to China or elsewhere without being detected by law enforcement.

On July 28, 2021, agents recorded a meeting between CW-1, the undercover agent, and HUANG in Newport, Rhode Island. During this meeting, HUANG explained that his "boss" needed to launder large amounts of proceeds from marijuana trafficking. The UC, in turn, explained to HUANG how the group's drug proceeds would be converted into cryptocurrency.

Once HUANG contacted CW-1 to report he would have cash to convert, HUANG and CW-1 would agree to meet in a public area. Once there, a drug courier looking to launder funds would bring a bag containing bulk cash to the meeting location with CW-1 and HUANG. CW-1 would confirm that the correct amount of money had been delivered and would then contact an undercover agent by phone. After the undercover agent received confirmation that the funds to be laundered had arrived, the agent would transfer an equivalent amount of cryptocurrency, minus a fee for service, to a digital wallet provided to the agent. The undercover explained that the person in control of the digital wallet (ZHANG) would be able to confirm the transfer within seconds.

During the meeting, the undercover agent made a small cryptocurrency transfer to a digital wallet that HUANG identified as belonging to his "boss." HUANG called his "boss" to confirm the transfer. Agents reviewed telephone records from HUANG's cell phone and determined that HUANG had called ZHANG.

After the mechanics of the money laundering operation were established, HUANG arranged meetings to drop off bags of cash to be converted to Tether, a type of cryptocurrency. On August 6, 2021, HUANG arranged to meet CW-1 at a TD Bank parking lot in Quincy to convert approximately $30,000 in cash to Tether. Once in the parking lot, HUANG spoke to a co-defendant, FENG CHEN, who arrived in a Porsche with a bag of cash. CHEN handed the bag of cash to CW-1; CW-1 advised the undercover that the cash had arrived; and the undercover transmitted $30,000 worth of Tether to ZHANG's digital wallet; and HUANG spoke to ZHANG, who confirmed he received the funds in his digital wallet. After the meeting, CW-1 provided agents with a bag containing $30,550, which included the fee for converting the funds to cryptocurrency.

On August 19, 2021, HUANG, ZHANG, and CHEN again worked to launder $30,500 in cash. For this deal, HUANG wanted to meet the undercover agent in person. CW-1 met HUANG

3

in Quincy. After the meeting started, agents observed CHEN arrive in a black Ford F150 truck registered to him. CW-1 and HUANG approached CHEN's Ford F150 truck. Shortly thereafter, the undercover arrived and parked his vehicle nearby. CHEN brought a pink and blue bag containing $30,500 in cash. CHEN handed the bag to HUANG who in turn handed the bag to the undercover. While HUANG and CHEN were present, the undercover converted the cash to Tether and sent the digital currency to ZHANG's digital wallet, minus the laundering fee. ZHANG confirmed to the undercover by phone that he had received the digital currency transfer. The undercover gave CW-1 the bag containing the cash. Agents followed CW-1 and the cash back to a predetermined meeting location, where CW-1 gave agents the bag of money. PSR, ¶¶ 10-14.

## ARGUMENT

The government's recommendation for 30 months in prison and three years of supervised release is reasonable and consistent with the factors set forth at 18 U.S.C. § 3553(a). To understand why, it is important to determine where HUANG fits in relation to others charged in the money laundering scheme. Each defendant falls into one of these three categories:

- ZHANG's Crew. Several co-defendants shared a personal connection to ZHANG or possessed a special skill useful to his money laundering operation. These co-defendants included (3) FENG CHEN, (4) ROGER LUO, and (12) QING HUA SUN, all of whom either helped ZHANG launder large amounts of bulk cash drug proceeds or facilitated laundering funds from victims of various internet and cryptocurrency scams. In addition, (8) RONGJIAN LI, a former Bank of America employee, opened and monitored accounts that accepted stolen funds which ZHANG then laundered. (2) HUANG's conduct and connection to ZHANG properly places him in this category;

- Drug Traffickers Associated With ZHANG. As the investigation progressed, ZHANG worked with (10) YANBING CHEN, (11) XIONG LIN and others to distribute kilograms of cocaine or ecstasy to the undercover agent; and

- Drug Customers of ZHANG's Money Laundering Service. Several of the defendants worked for various drug trafficking organizations that contracted with ZHANG to launder drug profits. The drug organizations sent couriers – including (5) THONG NGUYEN, (6) AGUSTIN VILLA, (7) MARIANO SANTANA,

4

sentenced on December 14, 2023 to approximately fourteen months in prison (ECF No. 212), and (9) QINLIANG CHEN, sentenced on November 8, 2024 to 15 months in prison and two years of supervised release (ECF No. 355) – to drop off bulk cash to members of ZHANG's crew. ZHANG took a fee for laundering this drug money and then converted it into cryptocurrency, thinking he was helping to ensure that the funds could be readily transmitted to criminal networks overseas.

HUANG's money laundering offense was serious. As noted by the government in earlier sentencing hearings, HUANG and his co-conspirators worked to transform proceeds derived from drug trafficking into funds with an apparently legal source which could be converted to cryptocurrency and transmitted overseas. This process has devastating consequences. Money laundering provides the fuel for drug traffickers and other criminal groups to operate and expand their enterprises. No criminal conduct is more suffused with violence that drug trafficking, and laundering money for drug traffickers is being a part of a drug trafficking organization.

HUANG was obviously involved in money laundering activities with ZHANG at the time he came into contact with the cooperating witness. He was intimately involved in devising and implementing the cash-for-cryptocurrency scheme for ZHANG's money laundering organization. He sketched out the details with people he believed were money launderers (but who were in fact undercover agents) during an hours-long meeting on a luxury boat in Rhode Island, a meeting which concluded with HUANG transferring a "sample" amount of digital currency to ZHANG himself. Agents had numerous recorded conversations with HUANG about money laundering before HUANG laundered drug profits. Once the scheme was up and running, HUANG worked with (3) FANG CHEN, another close associate of ZHANG's, to launder $61,000 in drug proceeds.

HUANG's money laundering would likely have continued on in this fashion for months or even years but for an investigative decision made by agents. On November 16, 2021, agents directed CW-1 to place a recorded telephone call to ZHANG directly. The cooperating witness introduced himself as a friend of HUANG's who had done "U" (an abbreviation for USDT, or

"Tether") transactions in Boston with HUANG. The cooperating witness reminded ZHANG that he had spoken to him before with HUANG. During the call, ZHANG complained that HUANG does not have a high degree of tolerance for larger cash transactions. ZHANG stated that if a transaction could be done face-to-face in New York, ZHANG could launder at least "20" (meaning $200,000). After this call, agents were able to use CW-1 to communicate with ZHANG directly.

The fact that agents successfully moved from HUANG, ZHANG's subordinate, to ZHANG, who was interested in laundering greater amounts of funds, does not exculpate HUANG or show him to be a minor participant in the offense. For that reason, Probation was correct to reject HUANG's assertion that he was a "minor" participant in the offense, a claim HUANG repeats in his sentencing memorandum. See PSR, Defendant's Objection #2 and Probation Officer's Response and (ECF No. 373). Also, the government is confident that this Court will reject HUANG's efforts to compare himself to co-defendant MARIANO SANTANA, a 55 year old man with limited formal education who had a significant history of substance abuse and mental health challenges who acted as a courier for a drug organization that used ZHANG to launder funds (ECF No. 211). SANTANA's actual "time served" sentence was fourteen months and two weeks long, so by seeking a "time served" sentence, HUANG essentially seeks a variance to a probationary sentence. HUANG's role in devising and implementing the money laundering scheme would make that result wholly inappropriate here.

The PSR shows HUANG to be able-bodied, free of addiction or mental health challenges, and capable of working. HUANG's chief complaint appears to be that he is experiencing stress related to the charges brought in this indictment and another, similar indictment brought before Judge Talwani which has "created a significant financial impact" on his village in China "due to the lack of funds being laundered to the village." PSR, ¶ 45. This is another way of saying that the

government's efforts to deter these kind of serious crimes are having their intended effect. A high end of the guideline sentence here would not only specifically deter HUANG but would deter others from engaging in these schemes, as well as promote respect for the law.

HUANG laundered drug proceeds because it was an easy way to make money, all while living in a country that had granted him political asylum. In the government's view, he deserves every day of the proposed 30 month sentence. 18 U.S.C. § 3553(a).

## CONCLUSION

For the reasons set out above, the government respectfully requests that this Court sentence LICHENG HUANG to 30 months in prison and three years of supervised release.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By:   /s/ Christopher Pohl
Christopher Pohl
Brian A. Fogerty
Meghan C. Cleary
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 11, 2024.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney